323-0474, Stratford, Lauderdale, and San Luis Obispo, at all, appellants by Stephen Tuoco, Chris's, Village of Channahon, affiliate by James Murphy. Counsel, you may proceed. Thank you. Good morning, Mr. Court. Mr. Murphy, I'm Stephen Tuoco. On behalf of the appellants in this case, and on behalf of my clients, we appreciate the opportunity to address the court in oral argument. We are here to seek and request reversal of a 2619 motion to dismiss that came out of the Will County Circuit Court that dismissed four counts of my client's amended complaint. We'd like to begin with something that I want to make sure is not lost, which is each one of my clients are a purchaser of property with a residential house on it. How did they get to the point where there was a house to purchase? It all begins with the appellee, the Village of Channahon. The Village of Channahon, as alleged in the amended complaint, made a policy decision to allow development of single-family residential homes on lots beside or adjacent to a floodway slough that's backwater to the DuPage River. They made a policy decision to permit that construction. They permitted a developer to submit flats, dividing up this area for development, and once those flats were allowed through the plan commission process, and then were permitted for sale by the developer, spec builders bought these properties. Mr. Prococo, under the concept of repose, where do you believe the Village's actions fall? Planning, design, supervision, observation, or management? The government action authorized with the permitting of construction, and that's where the question begins. To answer the question, the repose period is controlled by 13-214E. Obviously, this is residential construction from the authorized permit through the completion and the permission to sell. We've alleged two areas, two points in time, beginning in 2006 into 2008, in which we allege with sufficient detail what happened to have caused Village officials to understand that the basements in these houses had been constructed too deeply. With the obligation to protect people from flood hazard, the Village, we allege, had the obligation as fiduciaries to inform those people involved, including my clients, in what is known as Indian Trails North, the first phase of the subdivision in Shanahan, that there was a problem with their homes. What year was that, Council? It begins, the first flooding event that was significant starts in, I'm sorry, I misspoke, 1996. That's the first flood event? That is the first flood event, and we allege that the Village President at the time, Mr. Chesson was on site, FEMA was on site, they noticed that there wasn't surface flooding, but rather basin flooding. This lawsuit was filed when? This lawsuit was filed in 2020, within less than one year after the last flood event, which was in 2020. So we were within one year, and there's case law to suggest that even if one, the last flood, falls within a limitations period, it is timely to bring. But if you're thinking about the Tort Immunity Act, because this is inverse condemnation, this is not a tort case. And the Tort Immunity Act does not affect my client's right of action. It's based upon the Hampton decision in 2015, which sets the criteria for a takings case in the state of Illinois, which follows the Arkansas Fish and Game factors. So then what's the difference, in your opinion, then, between a claim based on property being taken versus property being damaged under the Illinois Constitution? Well, the taking is a little bit more strident. The damage to property comes into play, as discussed in Hampton, when there's public improvement. And that public improvement, nobody would doubt that it comes with subdivision. Subdivision construction. Water service. Sewer. In this case, there were septics, so that's not an issue. Water service. Streets. But the benefit to the public is not just physical. It is also economic, in population growth, in sales tax revenue increases, property tax revenue for schools and other things. So this is the public improvement. So continuing on, we have alleged sufficiently what the authorized government action was. And that is found in paragraph 57 of the amended complaint. Which is, three spec builders were given, they submitted proposed construction plans for these residential homes that all of my plaintiffs occupy. The village, through its enforcement officer, was the one with the power to require that which was permitted to be built. What was authorized, we allege, after an engineering study in 2009, which is split in our amended complaint, revealed that all of the basements, despite the fact there were three different spec builders submitting plans independent of each other, all the basements were within one inch, plus or minus, of a subterranean elevation of 519 feet. The base flood elevation for four of the six houses is 524 feet. Those basements were required to be built, we allege, five feet below the base flood elevation. Causing the propensity to flood. And in fact did recurrently flood, beginning in 1996, all the way through 2020. Now, they were required because the developer's plans were sent to the village. And they were approved? Well, the developer has the land, the developer sells the land to the spec builders. The spec builders purchase, they are the ones that submit the house construction plans. The builder? The builder, yes. The builder, the plans had to be submitted to the village, yes or no? Yes. Okay. And so the approval of the plans is what brings the village in. Right, because whatever the village requires in a permitted set of plans has force of law. Does that become, as an approval, become a requirement? Yes. Did the village require 524 feet? That's what we allege, because the as-built condition is all within an inch of 519. And the only way three spec builders could do the same thing at the same depth, almost precisely at the same depth consistently, would have to come from an authorization by an approved set of plans for what your foundation depth is going to be. And that's where those concrete foundational plans are set. And those get approved. So you have a permit to build exactly what the village told you in the final set of plans. You're telling me the permit, which is the action by the village. The permitting. Yeah, the permit. Yes. Action by the village. Yes. Is then not able to be deviated from at all? That's right. Because in our reply brief, we actually outline, one, what the village ordinance is regarding the enforcement officer's actions to what was required to be built. And then the ordinance that shows that these permitted sets of plans must be built by the force of law to what has been required. So back on the issue of being reposed, then you're saying planning is the one element out of the five. It's what is permitted. It's after the review is over, and we have a final set as the builder, this is what you must do. That's what we've alleged. Okay. Counsel, just to simplify this. Yes. Did the village make a mistake when they approved the plans, or did they make a mistake when they did not enforce what they approved? This is not a negligence case. I would say. That's my question. They deviated from what the FEMA regulation says. In their adoption, or in ultimately allowing these foundations to be that low? Allowing the, well, it's not allow. It's a requirement to do it at 519. 523, I thought you said. 519 is the depth. That's what they all are. As built. Right. The base flood elevation is five feet above. And according to the regulations that govern that plan set, as a participating community. Where did the village go wrong, counsel, is what I'm asking. What did they do wrong? Did they approve? They shouldn't have approved it because it was too, or they didn't, their building inspector didn't require it to be done the way it should be done. It all starts with the permitted set of plans as a final set that the builder has to build. 519 does not comply with their own ordinance, 703, which adopted all the FEMA regulations that govern floodplain development by a participating community. There's a FEMA regulation, we put it in the amended complaint, that requires in an A0 firm map special flood hazard area, which is where this is. You have to have the lowest elevation, which is the basement floor, at the base flood elevation or higher. That is the authorized government action that creates the foreseeable taking. This is not intentional. But because that FEMA regulation and where the lowest floor elevation must be, it is one of the factors of causation. So, not complying, you said that they adopted the FEMA regulation. In Ordinance 703, which is in our amended complaint. And that was appropriate. They didn't do anything wrong there. By adopting 703 and adopting all the FEMA regs? No, they did nothing wrong. As a matter of fact, they needed to include those as a participating community. So, the action of not forcing the builders to comply with that is where they went wrong? No, I'm saying the plan set told the builders, required them, you must build these floor elevation levels at 519. And you must put all the building sites as far away from the slough, on the lots, as far south as you can get them. And I gave you the overlay of the firm map in an excluded view, and we put in red what the house numbers are. Is that a derivative from the FEMA regulations? That they must be, we're getting a little confused here. The FEMA regulations, okay, are the backdrop. Yes. Village adopted those. Yes. But they didn't, by their actions, enforce them in improving the plans? Enforcement goes to tort. What I'm saying is, on the final plan set, they required 519. Okay. 519 did not match what the regulation required. Right. Which is why we needed 191B discovery to get the plan sets and to be able to show factually, as a matter of evidence, what the plan sets show. And as you are aware, we are alleging that was an abuse of discretion by the trial court when I was faced with a 619 motion to dismiss, and the need for 191B evidentiary discovery before having to respond. I don't have, I can't give you specific evidence because I was denied the plan sets on behalf of my clients to respond to the 619 motion that was ultimately granted. So, count one, inverse condemnation taking. Count two, damage to property as an alternative. Three, was continuing nuisance. Four, was continuing trespass. The invasion that is physical is flood water. My clients had a constitutional right to be freed from the physical invasion of public flood water flowing into their basements. Okay. It's almost like a but for. But for those plans being approved by the village, right? Well, and that's the thing. Let's not get into technicalities. You know, we'll get into all the legalese in a minute. Let's get the facts here. Sure. But your general common sense argument is, but for those plans being approved, maybe you don't like that word, by the village, it became then a requirement for the builder. Yes. A requirement for the builder, but again, this is affirmative action. So, it's not just a passive approval. It is a review and a requirement that has force of law at the end. Okay. Thank you. And so, your argument is the takings is that the village has taken, right? By requiring those plans or approving of those plans, which became mandatory for the builder. Arkansas Fish and Game Factor is that this is authorized government action that enabled or required a third party to build the plan set as the village required. So, it wasn't passive. It was active. And this is an affirmative act to say, you builder, you must build them the way the plan set shows. And obviously, the builders did exactly what they were supposed to do because they all came in right at 519. Right. We know that. Okay. Keep going then. And the physical invasion of perpetual, recurrent, temporary flooding to the degree of three feet in the basement has caused damage to property over and over and over again. Okay. Your time is up. Yes, it is. But there may be further questions from the court. Sure. Wait for rebuttal. I have one question. Sir, if we find that there was no taking, if we find that, then how does that impact the claim for damage, if we say that there was no taking? If the court believes and takes the position there was no taking? How does it impact the claim for damage? Right. It's the second clause of Section 15 of the Illinois Constitution, which is if damaged property arises that doesn't come to the degree of a taking but is related to public improvement, as the Supreme Court discussed at Hampton, my clients still have a right to compensate. And are you saying that the building of individual homes was a public taking, or excuse me, was a – what was the word that you just used? Public improvement. Public improvement. So when I began – You said the construction of homes. Well, it's not just that. It's the improvement of the tax base. It's the physical improvements to what had been agricultural land with streets, with water mains, with larger arterial streets to handle the in-and-out traffic that benefits the community. It is the property tax revenue increases, the sales tax revenue increases to have greater populations. So it all goes together. Thank you. Thank you. You'll have time in reply. Thank you. Counsel, you may respond. Good morning, Justice Holdredge, Justice Davenport, Justice Hedlund. Justice Davenport, to answer one of your questions in terms of where it falls within the statute of repose, it is either design, planning, or supervision because it's review of the whole plans and authorizing the plans. One of the things that I've been unclear of, and I think maybe the Court is still unclear, is is there a claim that the village changed the plans in a requirement? I think that's still left unanswered. But regardless of whether there was a change in the plans or authorization of the plans, the property owners at the time consented. They went forward. They built the houses. So they are certainly part of all this. And you can't have a taking where there's acquiescence. And there's certainly acquiescence here. I wanted to hear. Well, they couldn't deviate from those approved plans is what I'm hearing from opposing counsel. Well, you can't deviate, but you've actually submitted them and said, these are the plans we'd like to build to. Yeah. We want to do it at 524 feet rather than 519 feet. We approve that. But we agree that once you have approved plans, you're supposed to build them according to the plans that have been approved. But you picked it. You know, the homeowners, the property owners pick the depth. They pick the layout of the plans. They do go in. And then the question is also, how is this a constitutional issue? If you heard plaintiffs' counsel often talking about FEMA regulations, FEMA regulations are not Illinois constitutional issues. There has to be a taking. It's not just a violation of some ordinance, some federal plan, some federal regulation. It has to rise to an Illinois constitutional taking. So just because there's a violation, just because there's a mistake, just because maybe there was even negligence, that doesn't raise it to a constitutional level. There has to be something imposed on the property owner that takes the property. And going in there and just approving it doesn't do that. You seem to have a question. I do. I did want to point out also, with regard to the extent that wasn't touched on here, but in plaintiff's reply brief. And that's the idea that silence by the village or elected officials is supposed to extend the statute of limitations because they have a fiduciary duty. I want to touch on the fiduciary duty because plaintiffs have not cited one case that it imposes a fiduciary duty on a municipality with respect to individual citizens. Also, there's no case with respect to an individual elected government official that has fiduciary duties with respect to individual citizens. Furthermore, plaintiff's brief is wrong on two issues. First, it somehow claims that the Illinois Supreme Court recognized a fiduciary duty absent a statutory requirement. People-Bordeaux was actually based, and I quote, by an act of March 24th, 1874 that required principal to be invested after the sale of certain lands in Cahokia. And again, the court says the commons in the case, this was in Cahokia, were the property of the inhabitants of the village of Cahokia. It was provided by statute. And then, that the principal, which he was required to invest in government bonds, so again, statute, and then finally down at the end, it's talking a provision that a bond or security of the performance of the duties of trustees shall be given does not change the status of the parties or destroy the legal relation. The trust, referring to the trust provided by the statute, and therefore the fiduciary duties. That's the only mention of fiduciary duties going back to the statute. Plaintiff's also said that we had insisted that the Illinois Supreme Court case, that we had sort of distinguished Madelner, Finley, and Saviano, and said that's not found in some case. We were actually referred to the Supreme Court's case in Madelner, and where it distinguished Saviano and Cohen City, Chicago XRL, Cohen versus Keene. And the Supreme Court in Madelner said, we note initially that no case has been called to our attention that established the duty of a part of any government official absent a statute so provided. While the appellate court below cited People vs. Saviano, and City of Chicago XRL Cohen versus Keene, in support of those conclusions, neither case stands for the proposition that government officials have a duty to invest funds. It distinguished them. We went on. Unlike the conflict of interest in self-dealing situations involving Saviano and Keene, it distinguished them. The idea that somehow we were wrong in our statements made in our brief is just a neglect of looking at what the argument was in our briefs, or a neglect of looking at actually what the case has stated. So since we didn't have a response to that, I want to make sure that the court is very well aware of that. The other issue sort of is, is there, and this sort of goes to the continuing tort issue. And I think that counsel tries to be making an argument that there's a continuing tort because the last flood was in 2020. Well, the Illinois Supreme Court basically has said, for a continuing tort, you need to have a continuing violation. Now, plaintiffs have... Counsel, you said this wasn't a tort case. That immunity did not apply. Excuse me? That tort immunity doesn't apply? Right. Actually, and I have not looked at it, but the tort immunity statute, I looked at it yesterday. We have not pled the Tort Immunity Act at this point in time, but it is a one-year, and it goes beyond just torts. It goes to constitutional issues also. I think if you read the Tort Immunity Act, what it doesn't go to is issues where there's equitable relief, but as long as damages are being sought, the Tort Immunity Act does apply. But that's a different issue that's really not before the court at this time. It probably would be raised if it happens to go back. But the reality is, we were looking at the statute of repose that is sort of much easier to apply because it doesn't look at when a cause accrues, which you often get into when you're talking about tort immunity or any other portions of it with statute of limitations. Can you go back to your argument you were talking about a moment ago with the continuing tort? Certainly. The continuing tort requires that there actually be a continuing wrong, and in the case that was cited by plaintiffs in the Illinois Supreme Court case, the continuing wrong is actually the maintenance of the levy. The levy was on somebody else's property, on defendant's property.  It's not. It's their own homes that are causing either, and this is again where it's not entirely clear to me exactly what's being argued. Is it just because they're too low and the waters are going into the property, or because the properties were built there and by the basements themselves being there, the water level has actually increased, which sort of has entered into the slough and then come back into their property. I'm not sure that it really makes a difference, but there's a little bit of a confusion. It certainly helps distinguish probably what the maintenance of it is. So it would be a displacement issue then? It's sort of a displacement, yes. So that's where you would get into sort of some engineering, and I'm not even sure if there's so much displacement if it's actually coming back into the basement. Well, that's the mechanism of the flooding. Right. But FEMA assumedly understands that. Assumedly. And then they have a requirement, correct? I will agree that FEMA, well, there's sort of, there is a question of whether there's actually a requirement, based on where the certain lines are. But for purposes of the appeal, I will concede that FEMA has a requirement, and I would concede that they've alleged enough that the FEMA requirement was violated. That still doesn't get us to the point of having a violation of Illinois Constitution, nor does it even get into issues of when you get into nuisance or trespass. And I think the question you also had is, if we find there's no taking, where does that leave with damages? And I would say if there's no taking, there's no, there are no damages under the takings clause, or the takings counts. That would leave the nuisance count and the trespass counts, and for the reasons that we put in our brief, neither of those apply. You don't have a trespass because you don't have a causation of water coming in from some outside. It's sort of natural where it is. Again, unless the claim is the houses created more water by displacement, which doesn't seem to be a trespass either, and it's not a nuisance because it's not being caused from the outside. Again, it's being caused by the houses. I'm not sure if the maintenance argument would be, well, the village was supposed to tear down the houses instead, so the houses weren't maintained to create the additional water. That's, I guess, a potential argument, but it seems somewhat far-fetched, or somewhat counterintuitive at least. So, based on all of this, we believe that the dismissal should be affirmed by this court. No other questions? Thank you. Thank you. Would affirming the dismissal under the 2615 eliminate the need to address the discovery motion under 191B? Yes. And the other thing, the 191B, it was 191B, but actually the discovery they wanted was related to the 2615 portion of the motion, not the 2619 portion of the motion. And the 191B is to get discovery for 2619, not 2615. Thank you. Thank you. Thank you, counsel. Counsel, you may reply. I would encourage the court very strongly to look at the amended complaint, starting at page 4, going all the way to page 6. What it does, I'm sorry, it is in our opening brief, page 4 to page 6, we identify six factors that all come together to show that there is a super induction of water from the slough itself through the force of hydrology to actually start to permeate the soil on the backyards of my client's homes, penetrate the banks of the slough itself to then find its way through this very porous soil down to the water table level, which is shallow at 8 to 10 feet below each one of the houses. So it's super induced flood water that goes through porous soil. We've alleged that the village knew what the environmental conditions were, certainly would know what the science is of the hydrology and how the flood water would behave in this riverine environment, to then find its way to the water table, to add to its volume, and to make it rise as the water is high and ultimately find its way through the subholes in my client's basement. Thus, the lowest floor level is one of the most important factors in how this continuing recurring physical invasion of public flood water occurs and why it was foreseeable that if these basement floor levels were at 5 feet below the base flood elevation, you are going to have predictably and did in fact did have recurrent flooding up to as high as 3 feet on lot 16 in one of the floods. Now, theoretically, if you engineered that basement, how high must it be above the base flood level? The highest historical flood recorded was in 1996 at 522. So, if the houses were built with the lowest floor levels at 524, they would not have flooded. But I have to address... Based on historical data. Right. But that's hard to predict the future, isn't it? Well, all I can do is deal with what I have. And since it's already 5 feet below, if you have any more significant rainfall, chances are they will. So, I have to address the fiduciary issue because Mr. Murphy is skilled, obviously. He's been an able counterpart. But I have to take you to our reply brief. We did, in fact, rebut exactly what he said we did not. On page 4 through page 5, we address exactly what they raised in their response. And I cited Gross, Halperin, Kilroy, Kenroy. And there's a section in the Gross case that says, it has long been established in Illinois that a public official occupies a fiduciary relationship to a public entity on behalf of who he serves. And that's the Kenroy case, Illinois Supreme Court, 1980. It's common law duty. It's not based upon a statute. Though, the court continues. Emanating in part from section 3. The duty is owed by whom to whom? Public officials on behalf of a municipality to its constituent, and in this case, its six homeowners. That's that quote? Says that? Can you read it again, please? Sure. A public official occupies a fiduciary duty to the political entity on behalf of who he serves. And do we have any further definition of a political entity? And it continues. The most well-known of public officials' fiduciary duties is that undivided loyalty to the office and to the people who he serves. Okay. This is page 4. This is the quotation from Gross. I couldn't be in a planner and reply, so I don't know why that was said, was not responded to in some way. Now, getting on to the constitutional right. The court has to appreciate the fact that the spec builder is the one purchasing the land to do one particular thing, build a house, and then sell it. They don't ever occupy it. The foreseeable person who has a constitutional right to be free from a physical invasion of water is the person who purchased it from the spec builder. They are the resident. They are the foreseeable plaintiff who will occupy the property. So it's the plaintiffs we have to focus on. Thank you. Okay. Thank you, Counsel. Thank you, Counsel Bowles, for your arguments in this matter this morning. It will be taken under advisement and a written disposition shall issue.